IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CASSANDRA MAYO, | ) | CASE NO. 1:11CV2748 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Cassandra Mayo ("Plaintiff" or "Mayo") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security

Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  As set

forth below, the Administrative Law Judge ("ALJ") failed to consider Mayo's depression in

assessing her Residual Functional Capacity ("RFC").  For that reason, the final decision of the

Commissioner should be **REVERSED AND REMANDED.**

## I. Procedural History

On September 19, 2007, Mayo filed an application for SSI, alleging a disability onset

date of September 6, 2007.  Tr. 141.  Mayo claimed that she was disabled due to a combination

of impairments, including depression, diabetes, neuropathy in her feet, muscle spasms,

degenerative disc disease, and asthma.  Tr. 54-56, 63-65.  The state agency denied Mayo's claim

initially and upon reconsideration, and Mayo timely requested a hearing before an ALJ.  Tr. 52-

59, 70.  On June 3, 2010, a hearing was held before ALJ John Murdock.  Tr. 26-51.  On July 29,

2010, the ALJ issued a decision finding that Mayo was not disabled.  Tr. 11-21.  Mayo requested

review of the ALJ's decision by the Appeals Council on August 21, 2010.  Tr. 6.  On October 20,

2011, the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-5.

## II.  Evidence

### A.    Background

Mayo was born on January 2, 1964, and was 43 years old at the time she filed her SSI

application.  Tr. 20, 30.   She completed the 11th grade but did not graduate from high school.

Tr. 30.  Mayo's past work history included work as a cashier, fast food worker, and kitchen

worker.  Tr. 45.

### B.    Medical Evidence

#### 1.    Physical Impairments

Mayo treated with Teah Abashidze, M.D., her primary care physician, from December

2006 through the date of the administrative hearing.  Tr. 206-12, 306-07, 316, 535-42.  Mayo

saw Dr. Abashidze on October 5, 2007.  Tr. 206.  She diagnosed Mayo with non-insulin

dependent diabetes and diabetes mellitus neuropathy.   Tr. 206.  At an office visit on December

10, 2007, Dr. Abashidze noted that Mayo was still smoking and had an exacerbation of her

chronic obstructive pulmonary disease, which caused a "terrible cough."  Tr. 312.  She advised

Mayo to quit smoking.  Tr. 312.

On December 28, 2007, Mayo underwent a consultative examination by state agency

physician Wilfredo M. Paras, M.D.  Tr. 214-21.  At the exam, Mayo reported that her medical

conditions included diabetes, asthma, chronic bronchitis, and chronic low back pain.  Tr. 214.

She stated that she could understand and concentrate fairly well, that she was able of self care

and performing regular household chores, and that she could lift and carry 15 to20 pounds with

2

both hands.  Tr. 215.  Mayo acknowledged that she smoked a half pack of cigarettes a day and occasionally drank beer.  Tr. 215.  Dr. Paras assessed Mayo as having a history of bronchial asthma/bronchitis, diabetes mellitus with diabetic peripheral neuropathy, hypertension, chronic low back pain, and carpal tunnel syndrome of the right hand.  Tr. 214-16.  Manual muscle testing showed normal grasp, manipulation, pinch, and fine coordination of both hands.  Tr. 218.  Mayo showed good (a "4" on the motor findings scale) movement of her shoulders, elbows, wrists, and fingers.  Tr. 218.  She had no muscle atrophy or muscle spasm.  Tr. 219.  Further, Dr. Paras took x-rays of Mayo's lower back, which revealed minimal spondylosis at L3, L4, with preserved disc height, and no other lumbar spine abnormality.  Tr. 217.

In mid-January 2008, state agency physician Charles Derrow, M.D., reviewed the medical evidence and completed a Physical Residual Functional Capacity Assessment.  Tr. 222-29.  He determined that Mayo retained the capacity to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday, with the ability to occasionally climb, stoop, kneel, crouch, or crawl.  Tr. 223.  He limited Mayo to frequent use of her right hand (as opposed to "continuous" use).  Tr. 224.

On April 30, 2008, Mayo began treating with Eugene W. Lin, M.D., a physical medicine and rehabilitation specialist, for lower back and leg pain.  Tr. 285.  Mayo's musculoskeletal examination was negative, showing no arthritic pain, no joint swelling, and no muscle weakness.  Tr. 285.  Dr. Lin noted that Mayo demonstrated normal ambulation, a negative straight leg raising test, and normal motor strength of the extremities.  Tr. 286.  On palpation, Dr. Lin noted that Mayo had tenderness in the lumbosacral junction.  Tr. 286.  Mayo informed Dr. Lin that she

could not afford the medication Lyrica,[1] so he prescribed Neurontin instead.  Tr. 286.

Mayo saw Dr. Lin on June 11, 2008 for complaints of back pain.  Tr. 273-74. With respect to her diabetic peripheral neuropathy, Mayo reported that her feet felt better since starting on Neurontin but that she had pain in her back and buttocks.  Tr. 273.  Dr. Lin assessed Mayo as having sacroiliac joint pain/sacroiliitis and generalized osteoarthritis.  Tr. 273-74.  He also noted that Mayo had undergone physical therapy with minimal results.  Tr. 273.  Dr. Lin prescribed a back brace and a breathing machine. Tr. 273.

On July 7, 2008, Dr. Abashidze completed a physician questionnaire.  Tr. 234-36.  She reported that Mayo had uncontrolled diabetes and diabetic peripheral neuropathy with causes motor loss and sensory deficits.  Tr. 235-36.  On August 15, 2008, Dr. Abashidze completed a medical source statement regarding Mayo's physical residual functional capacity ("RFC").  Tr. 306-07.  She opined that Mayo could stand/walk for 2-3 hours in an 8-hour workday, for 2 hours uninterrupted, and sit for 2-3 hours in an 8-hour workday, for 2 hours uninterrupted.  Tr. 306. Dr. Abashidze attributed Mayo's limitations on standing/walking to her diabetic neuropathy and her limitation on sitting to her chronic back pain.  Tr. 306.  She also limited Mayo to occasional climbing, balancing, stooping, crouching, kneeling, crawling, reaching, handling, feeling, pushing, pulling, and fine and gross manipulation.  Tr. 307.  Dr. Abashidze assessed environmental restrictions concerning temperature extremes, chemicals, dust, and fumes.  Tr. 307. She noted that Mayo had been prescribed a back brace and a breathing machine.  Tr. 307.

On September 25, 2008, Mayo saw Dr. Lin's resident, Richard Aguilera, M.D.  Tr. 343. She complained of lower back pain that was intermittent and went into her legs.  Tr. 343.  She also stated that her feet felt better since taking Neurontin.  Tr. 343.  Dr. Aguilera assessed Mayo

---

[1]  It should be noted that Mayo reported to Dr. Adashidze in September 2007 that she felt "much better on Lyrica." Tr. 207.

as having lumbar spondylosis and physical findings consistent with sacroiliitis.  Tr. 344.  He recommended a sacroiliac joint steroid injection, but Mayo declined.  Tr. 344.

Mayo saw Dr. Abashidze on October 21, 2008, and reported that she was "doing o.k." Tr. 315.  She noted that Mayo was still smoking.  Tr. 315.  Dr. Abashidze referred Mayo to a rheumatologist for evaluation of possible rheumatoid arthritis.  Tr. 315.

On November 17, 2008, Mayo saw Nada Al-Skaf, M.D. and Stanley Ballou, M.D., for a consultation to determine if she had rheumatoid arthritis.  Tr. 339-42.  Mayo complained of joint pains, primarily in her hands, wrists, knees, and feet.  Tr. 341.  She stated that the pain in her feet was the most severe and increased with walking.  Tr. 341.  Mayo had some tenderness in the joints of her hand and slightly reduced grip strength, and her left wrist was normal.  Tr. 341.  Dr. Ballou noted that Mayo's history and examination were consistent with rheumatoid arthritis.  Tr. 341.  He recommended that Mayo begin using anti-inflammatory medication on a regular basis, as well as methotextrate for rheumatoid arthritis.  Tr. 341.

 Radiographic studies of Mayo's feet taken in mid-November 2008 showed no significant soft tissue or bony abnormalities.  Tr. 323-25.  It was specifically noted that there were "no radiographic changes suggestive of rheumatoid arthritis."  Tr. 324.

Mayo reported to Dr. Abashidze on December 13, 2008.  Tr. 314.  She complained of bilateral feet numbness due to her diabetic neuropathy.  Tr. 314.  Dr. Abashidze stated that Mayo did not take her insulin at all.  Tr. 314.  Dr. Abashidze also noted that Mayo had bronchitis and migraines and that she continue to abuse tobacco.  Tr. 314.

On December 15, 2008, Mayo saw Dr. Al-Skaf for a follow up examination.  Dr. Al-Skaf stated that Mayo had a 50% improvement in her hand symptoms and significant improvement in her knee pain, but no improvement with morning stiffness and foot pain.  Tr. 336.  Mayo

reported that she was not taking Ibuprofen daily as recommended but only 2-3 times per week. Tr. 336. On examination, her muscle strength was normal and she had no joint tenderness, swelling, warmth, or redness of her hands. Tr. 337. Dr. Al-Skaf assessed Mayo as having "resolved hand pain." Tr. 337. An MRI of Mayo's right foot taken in late December 2008 at Dr. Al-Skaf's request for possible synovitis was negative. Tr. 326.

Mayo had a follow-up examination with Dr. Al-Skaf on January 15, 2009. Tr. 319. She reported morning stiffness that lasted two hours. Tr. 319. Dr. Al-Skaf confirmed that Mayo did not have rheumatoid arthritis based upon additional testing. Tr. 320. On examination, Mayo had no swelling, no synovitis, and some joint tenderness. Tr. 320. Her muscle strength was normal. Tr. 320. Mayo stated that she had foot pain, which she described as new and different from the pain associated with her diabetic neuropathy, but an MRI of her foot was negative for an inflammatory process. Tr. 320. Dr. Al-Skaf's assessment was "unexplained hand/feet pain and stiffness." Tr. 321.

On January 23, 2009, Mayo saw Brandon Miller, M.D., for an examination regarding her joint pain. Tr. 317. With regard to the pain in her hands, Mayo reported that morning stiffness resolved within three hours and that her pain resolved more gradually. Tr. 317. On examination, Dr. Miller noted that Mayo had no pain or stiffness with passive wrist flexion, no tenosynovitis of the wrists, no warmth or swelling of the wrists, but that she did have some tenderness. Tr. 318. He noted some stiffness and pain with passive movement bilaterally in the ankles and diffuse tenderness in the toes. Tr. 319.

On June 11, 2009, Mayo presented to Howard R. Smith, M.D., at the Rheumatology and Pain Management Center, for evaluation of her low back pain and bilateral foot pain. Tr. 433-35. With respect to prior treatment, Mayo reported that she had undergone physical therapy, but

that she declined nerve blocks because of her fear of needles.  Tr. 433.  She stated that the medications Motrin and Neurontin "helped some."  Tr. 433.  Mayo also reported that she smoked a half pack of cigarettes a day, drank 40 cans of beer a week, and smoked marijuana two times per week.  Tr. 433.  On exam, Dr. Smith noted that Mayo had wheezing and a cough.  Tr. 433.

Mayo saw Dr. Smith for a follow-up appointment on July 8, 2009.  Tr. 429-31.  She complained of numbness and tingling of the feet and toes and occasionally in her hands.  Tr. 429.  On exam, Dr. Smith noted that Mayo's extremities were all within normal limits – she had full range of motion, normal muscle strength and tone with no atrophy, and normal gait and station.  Tr. 430.  He also noted that Mayo had a "significant ETOH [alcohol] history."  Tr. 430.  His primary diagnosis was diabetes type II with neurological manifestations.  Tr. 430.

On November 24, 2009, Mayo reported to Dr. Smith, complaining of bilateral lower extremity pain.  Tr. 495-98.  Physical examination revealed tenderness bilaterally in Mayo's feet, but not swelling, erythemia, or effusions.  Tr. 497.  Gait and station were normal.  Tr. 497.  Muscle strength and tone were normal with no atrophy or abnormal movements.  Tr. 497.  Dr. Smith continued Mayo's medications and increased her dosage of Lyrica.  Tr. 498.

At a follow-up appointment with Dr. Smith on December 29, 2009, Mayo complained of lower back pain.  Tr. 489-91.  Musculoskeletal examination was normal but Mayo had a "mildly antalgic" gait.  Tr. 490.  Dr. Smith recommended that Mayo "re-try" Tramadol because it was effective.  Tr. 490.  He further reported that Mayo's diagnosis of rheumatoid arthritis was unclear and that her pain may be related to her diabetic neuropathy.  Tr. 491.  Dr. Smith again noted that Mayo consumed 6 cans of beer per day.  Tr. 490.

Mayo was involved in a car accident on February 9, 2010.  Tr. 478.  The next day, she went to the Huron Hospital Emergency Room complaining of back pain. Tr. 475-82.  Physical

examination revealed tenderness at L5-S1.  Tr. 471.  Mayo was discharged with a prescription for Flexeril and instructed to follow-up with her pain management doctor.  Tr. 478, 482.

### 2.     Mental Impairments

Mayo alleged that she was disabled due, in part, to her depression.  Tr. 63-65.  On April 30, 2008, she underwent a consultative psychological examination by state agency psychologist Jeff Rindsberg, Psy.D.  Tr. 239-43.  Mayo reported that her health problems began in 2001 after giving birth to her youngest child.  Tr. 239.  Dr. Rindsberg noted that Mayo held resentment towards her family members, who urged her to have her last child.  Tr. 240.  Mayo stated that she never had an alcohol problem but that she drank four cans of beer every evening to help her sleep.  Tr. 240.  Mayo also stated that she was unable to work because "places are too far and she needs to be close to her house."  Tr. 240.  She reported that she felt depressed because of all of the medication she was taking.  Tr. 240.  A mental status examination showed that Mayo had a calm mood, no psychosis, average intelligence, and good insight and judgment.  Tr. 242.  Dr. Rindsberg diagnosed Mayo as having Adjustment Disorder with Depressed Mood.  Tr. 242.  He opined that Mayo did not have any impairment in her ability to understand and follow instructions; a mild impairment in ability to maintain attention and to perform simple, repetitive tasks; a moderate impairment in ability to relate to others, including coworkers and supervisors; and a mild impairment in ability to withstand the stress and pressures associated with day-to-day work activities.  Tr. 243.

On May 20, 2008, Alice Chambly, Psy.D., a state agency reviewing psychologist, reviewed the medical evidence and completed a Mental Residual Functional Capacity Assessment.  Tr. 245-48.  In her assessment, she gave weight to the report of Dr. Rindsberg.  Tr. 247.  Dr. Chambly opined that Mayo would be moderately limited in her abilities to interact

appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 246.  She also opined that Mayo could perform simple, repetitive tasks in an environment without high production demands.  Tr. 247.

On June 30, 2008, Mayo began seeing Deborah Gould, M.D., for treatment of her mental health issues.  Tr. 471-74.  At her initial evaluation, Mayo reported feeling "stuck" since having her last child eight years earlier.  Tr. 471.  She reported that she did not try to go back to work after her pregnancy.  Tr. 472.  Mayo stated that she used alcohol and marijuana to help her relax and to "make her pain meds work better."  Tr. 472.  Mayo explained that she believed she had a problem with alcohol, but that she had been unsuccessful in trying to quit.  Tr. 472.  A mental status examination showed that Mayo had logical thought processes, no hallucinations or other perceptual disturbances, no self-abuse, no delusions, clear speech, average eye contact, and an average demeanor.  Tr. 472.  Her energy and motivation were down, but her concentration was good.  Tr. 471.  Dr. Gould noted that Mayo was cooperative, but withdrawn, and had a depressed mood and constricted affect.  Tr. 473.  Dr. Gould found that Mayo had no impairment of cognition and had an average intelligence.  Tr. 473.  She diagnosed Mayo as having Major Depressive Disorder, Recurrent, as well as Alcohol Abuse vs. Depression and Cannabis Abuse vs. Depression.  Tr. 473.  She also assigned Mayo a Global Assessment of Functioning ("GAF") score of 50.[2]  Tr. 473.  She prescribed Lexapro and advised Mayo to stop smoking marijuana, as it was a depressogenic.  Tr. 474.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

Thereafter, Dr. Gould saw Mayo on a monthly basis.  Dr. Gould frequently reported that Mayo presented with poor or decreasing insight and judgment.  Tr. 449, 451, 455, 459, 465, 531, 533.  Dr. Gould also noted that Mayo exhibited a disheveled appearance, constricted affect, and dysphoric mood during treatment.  Tr. 455, 461, 467, 531.  In August 2008, Mayo described her mood as "okay" and stated that she did "not feel depression was a major problem."  Tr. 469-70.  Dr. Gould noted that Mayo "uses pot daily, drinks 6 pack [of] beer daily."  Tr. 469.  She discussed substance abuse with Mayo.  Tr. 470.  In September 2008, Mayo reported that she continued her use of marijuana and alcohol.  Tr. 467-68.  Dr. Gould prescribed Zoloft and Ambien.  Tr. 467.  In October 2008, Dr. Gould reported that Mayo's mood was better and that her anxiety had improved with an increase in her Zoloft dosage.  Tr. 465.  Dr. Gould continued to discuss supportive therapy for Mayo's substance abuse.  Tr. 466.  In November 2008, Dr. Gould stated that Mayo had improved overall but that her chemical dependency issues still had to be addressed.  Tr. 464.  In December 2008, Dr. Gould noted that Mayo's depression had worsened due to multiple psychosocial stressors, i.e., her boyfriend had a stroke and her furnace broke.  Tr. 461.  Dr. Gould noted that Mayo was still smoking marijuana and drinking alcohol on a daily basis.  Tr. 461.  At a session in late December 2008, Mayo stated that she could not afford gas to go to "Beachwood" for a chemical dependency evaluation.  Tr. 459.

At a session with Dr. Gould in January 2009, Mayo reported that she was doing better with respect to her mood and that she had cut down on drinking and smoking marijuana.  Tr. 457.  In mid-February 2009, Mayo complained of depression secondary to psychosocial stressors.  Tr. 455.  Dr. Gould noted that Mayo was still drinking and smoking marijuana and that she had "no intention of stopping."  Tr. 455.  Dr. Gould stated that Mayo's affect was mildly constricted and her mood was mildly dysphoric.  Tr. 455.  Dr. Gould concluded that Mayo's

"substance abuse remains more of a problem than she is willing to admit."  Tr. 456.  At a session
in late February 2009, Mayo reported that she found parenting stressful and preferred to be
alone.  Tr. 453.  Dr. Gould noted that Mayo was lacking social interaction by choice.  Tr. 454.

In late March 2009, Dr. Gould again noted that Mayo was continuing to drink and smoke
marijuana and that she had no intention of stopping.  Tr. 451.  At a session in early June 2009,
Dr. Gould had another discussion with Mayo about her alcohol use, but Mayo was "not willing
to address" it.  Tr. 450.  Dr. Gould noted that, as of mid-July 2009, Mayo was "drinking more."
Tr. 447.  She refused to participate in the chemical dependency program, but was agreeable to
counseling.  Tr. 448.  Dr. Gould found that Mayo's mood was stable.  Tr. 447.  In mid-October
2009, Dr. Gould reported that Mayo continued with her substance abuse issues, which she had
yet to address.  Tr. 533.  The next record from Dr. Gould, dated December 2009, states that
Mayo was drinking even more on a daily basis (more beer and the addition of gin).  Tr. 531.
Mayo affirmed that she did not want to address her substance abuse issues despite the fact that
Dr. Gould had made repeated attempts to help her.  Tr. 532.

### 3. Evidence Submitted After the ALJ's Decision

Mayo submitted additional medical evidence to the Appeals Council after the ALJ's
decision in July 2010.  Tr. 546-685.  This evidence consists of additional records from Drs.
Gould, Smith, and Abashidze.  However, Mayo makes no argument concerning these records
and, in fact, concedes that they are not material to her disability claim.  Doc. 12, p. 9.  As such,
these records will not be considered in this Report and Recommendation.

### C.      Administrative Hearing

#### 1.      Mayo's Testimony

On June 3, 2010, Mayo appeared with counsel and testified at a hearing before the ALJ. Tr. 28-44.  Mayo testified that she uses a cane for balancing and long distance walking but that she does not need it around the house.  Tr. 31.  Mayo testified about her diabetes and stated that she developed gestational diabetes in 2001 with her last pregnancy and that it never went away. Tr. 31-32.  Mayo explained that she was attempting to get her blood sugar down by limiting her food intake and through medication.  Tr. 32.  Mayo also testified that she gets muscle spasms due to her diabetic neuropathy if she walks for longer than 10 minutes.  Tr. 33.

#### 2.      Vocational Expert's Testimony

Ted Macy appeared at the hearing and testified as a vocational expert (the "VE").  Tr. 45-51.  He stated that Mayo had previously worked as a cashier (unskilled work at a light exertional level), a fast food worker (unskilled work at a light exertional level), and a kitchen worker (unskilled work at a medium exertional level).  Tr. 45.  The ALJ asked the VE whether a hypothetical individual with Mayo's vocational characteristics and the following limitations could perform any of her past relevant work:

> [C]apable of a range of sedentary work limited [in] these ways: Positions should never require what I call industrial climbing, ropes, ladders and scaffolds, but could occasionally require other climbing, balancing, stooping, kneeling, crouching, and crawling.  The position should also avoid hazardous machinery and heights.

Tr. 45-46.  The VE responded that the hypothetical person could not perform any of Mayo's past relevant work.  Tr. 46.  The VE then stated that the individual could perform other work that existed in significant numbers in the national economy, including the following jobs: final assembler (90,000 jobs nationally), bench assembler (60,000 jobs nationally), and electronics worker (60,000 jobs nationally).  Tr. 46-47.

Counsel for Mayo was given the opportunity to examine the VE.  He asked the VE if the additional limitation of being off task for 20 percent of the day due to pain and pain symptoms would impact the number of identified jobs.  Tr. 48.  The VE responded that being off task 20 percent of the time would be unacceptable in a competitive setting.  Tr. 48.  Counsel also asked the VE if a limitation of not working around any type of dusts, fumes, or odors would reduce the number of jobs available.  Tr. 48-49.  The VE testified that such a limitation would eliminate most of the identified jobs.  Tr. 48-49.  Counsel also asked the VE to consider a limitation of occasional ability to grasp with the right dominant hand.  Tr. 49.  The VE stated that there would be at least frequent grasping by one hand or the other but that the identified jobs would only be affected if the individual could not accommodate the occasional grasp limitation by using the non-dominant hand.  Tr. 49.  Counsel then changed the limitation to occasional fingering with the dominant right hand.   Tr. 50.  The VE testified that none of the identified jobs required much fingering and the limitation would not have much effect on the number of available jobs.  Tr. 50.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do hi s pr evious w ork but  c annot, c onsidering hi s a ge, e ducation, a nd w ork experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ

is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  I f claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  The claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Mayo had not engaged in substantial gainful activity since her application date of September 19, 2007.  Tr. 13.  At Step Two, he found that Mayo had the following severe impairments: chronic obstructive pulmonary disease, diabetes mellitus with diabetic peripheral neuropathy, hypertension, chronic low back pain, and carpal tunnel syndrome of the right hand.  Tr. 13.  At Step Three, the ALJ found that

Mayo did not have an impairment or combination of impairments that met or medically equaled

one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[3]  Tr. 15.  The ALJ then

determined Mayo's RFC and found that she could perform sedentary work except that she could

not climb ropes, ladders, or scaffolds, but could occasionally do other climbing, balancing,

stooping, kneeling, crouching, and crawling.  He also found that she must avoid hazardous

machinery and heights.  Tr. 15.  At Step Four, the ALJ found that Mayo could not perform her

past relevant work.  Tr. 20.  Finally, at Step Five, after considering her vocational factors, her

RFC, and the evidence from the VE, the ALJ found that Mayo was capable of performing work

that existed in significant numbers in the national economy.  Tr. 20-21.  The ALJ therefore

concluded that Mayo was not disabled.  Tr. 21.

## V.  Arguments of the Parties

Mayo objects to the ALJ's decision on three grounds.  First, she asserts that the ALJ

improperly evaluated the opinions of several treating and consulting physicians.  Second, Mayo

argues that the ALJ erred because he failed to consider any limitations resulting from Mayo's

depression, her carpal tunnel syndrome in her dominant right hand, and her chronic obstructive

pulmonary disease.  Third, Mayo argues that the ALJ erred in relying on vocational expert

testimony that was elicited in response to an incomplete hypothetical.

In response, the Commissioner argues that the ALJ properly considered the medical

source opinions.  He also argues that the ALJ properly evaluated Mayo's RFC and that this

determination is supported by substantial evidence.  The Commissioner further argues that the

ALJ properly relied on the VE's testimony.

---

[3]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and d escribes i mpairments  for each  o f t he  major b ody s ystems t hat t he  Social S ecurity  Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. The ALJ's Analysis of Mayo's Depression

Mayo argues that the ALJ erred at Step Two of the sequential analysis by concluding that her depression was not a severe impairment. According to Mayo, the objective evidence proves that her depression caused more than a minimal degree of restriction in her ability to work.

At Step Two, the Commissioner must consider whether a claimant has a severe impairment. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains

objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act ...." *Despins v. Comm'r of Soc. Sec.,* 257 F. App'x 923, 929 (6th Cir. 2007).  The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."[4] 20 C.F.R. §§ 404.1520(c), 416.920(c).

The Sixth Circuit has generally described Step Two as "a *de minimus* hurdle." *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190 (6th Cir. 2009).  "[A]n impairment can be considered not severe only if it is a ***slight abnormality*** that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988) (emphasis added).  The claimant bears the burden at Step Two of establishing that an impairment is severe.  *See Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The mere existence of impairments, however, does not establish significant limitation in "performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930.

Nevertheless, even when an ALJ fails to list one of the claimant's impairments as severe, the error will not always warrant reversal. Remand is not necessary as long as the ALJ finds the claimant suffers from at least one severe impairment at Step Two and continues to evaluate both the claimant's severe and non-severe impairments during the latter steps of the sequential analysis. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  In other words, if an ALJ errs by not including a particular impairment as an additional severe impairment at Step Two, the error is harmless so long as the ALJ ultimately considers all of the claimant's impairments in determining the claimant's RFC.  *See Swartz v. Barnhart*, 188 F.

---

[4] Basic work activities are defined by the regulations as "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. App'x. 181, 190 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

App'x 361, 368 (6th Cir. 2006 ) (citing *Maziarz*, 837 F.2d at 244 ).

In this case, the ALJ concluded that Mayo's depression did not have more than a minimal impact on her ability to perform basic mental work activities.  Tr. 13.  When analyzing the severity of Mayo's depression, the ALJ reviewed the assessment prepared by Dr. Rindsberg, the state agency consulting psychologist who examined Mayo.  The ALJ then considered "the four broad functional areas set out in the disability regulations for evaluating mental disorders" (20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00(C)) and found that Mayo's mental impairment caused only mild limitations in her activities of daily living; mild limitations in her social functioning; mild limitations in concentration, persistence, or pace; and no episodes of decompensation of extended duration.  Tr. 14.  The ALJ concluded that, because her mental impairment caused no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation, it was not severe.  Tr. 15.

However, in reaching this conclusion, the ALJ did not discuss any of the evidence from Dr. Gould, Mayo's treating psychiatrist, who diagnosed Mayo with Major Depressive Disorder. Tr. 13-15.  Even though Dr. Gould did not offer any opinion on whether Mayo's depression affected her ability to perform basic work-related activities, Dr. Gould's treatment notes indicate that Mayo did in fact suffer from depression and that her depressive symptoms changed during the course of treatment.[5]  Tr. 449, 451, 455, 459, 461, 465, 467, 531, 533.  In addition to the evidence from her treating physician, state agency consultant Dr. Rindsberg examined Mayo and found that her ability to relate to others, including fellow coworkers and supervisors, was moderately impaired due to her depressive symptoms.  Tr. 243.  He specifically stated that Mayo "has had decreased social contact since her depression."  Tr. 243.  Furthermore, Dr. Chambly,

---

[5] It should be noted that the ALJ did not even mention Dr. Gould in his opinion and it is unclear if he actually considered any of the medical evidence from Dr. Gould.  However, the ALJ was aware of this evidence because he specifically questioned Mayo about treatment records from Dr. Gould at the administrative hearing.  Tr. 37-38.

the state agency reviewing psychologist, opined that Mayo would be moderately limited in her ability to interact appropriately with the general public, moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 246.

The evidence from Dr. Gould, Dr. Rindsberg, and Dr. Chambly, at a minimum, created reasonable doubts as to whether Mayo's depression caused more than a "slight abnormality" affecting her ability to work.  Both state agency psychologists opined that Mayo's depression resulted in more than minimal restrictions on her ability to function in certain areas.  Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  Based on this evidence, the ALJ should have resolved the reasonable doubts as to the severity of Mayo's depression in her favor.  *See, e.g., Newell v. Comm'r of Soc. Sec*., 347 F.3d 541, 546-47 (3d Cir. 2003) ("Reasonable doubts on severity are to be resolved in favor of the claimant") (citing SSR 85-28 (1985)); *see also Fetters v. Astrue*, 2009 WL 632603, at *3 (W.D. Pa. 2009) (finding that the ALJ should have concluded that the claimant's depression was a severe impairment under the regulations since both the consultative examining psychologist and the state agency medical consultant psychologist indicated that the claimant's depression resulted in more than minimal restrictions on her ability to function in certain areas).  The ALJ therefore erred by failing to find that Mayo's depression was a severe impairment.

As discussed above, if an ALJ errs by not including a particular impairment as an additional severe impairment at Step Two, the error is harmless so long as the ALJ ultimately considers all of the claimant's severe and non-severe impairments in determining the claimant's

RFC. *Maziarz*, 837 F.2d at 244.  Here, the ALJ found that Mayo suffered from other severe impairments and continued with the sequential analysis.  However, in determining Mayo's RFC, the ALJ completely failed to consider her depression or evaluate whether it caused any limitations in her ability to work.  Indeed, the ALJ did not factor any limitations relative to Mayo's depression into the RFC analysis or explain his reasons for declining to do so.  Accordingly, the ALJ's error at Step Two cannot be considered harmless because he did not consider all of Mayo's impairments in making his RFC determination.  Because the ALJ failed to consider Mayo's depression in assessing her RFC, the case should be remanded so that the ALJ can consider the functional limitations, if any, resulting from Mayo's depression.

## C.      Other Issues

Mayo also argues that the ALJ's erred by rejecting the opinions of her treating physicians, Dr. Abashidze and Dr. Gould, as well as the opinions of state agency physicians Dr. Rindsberg and Dr. Chambly.  Doc. 12, p. 10.  The undersigned will not reach these issues because, on remand, the ALJ will necessarily re-examine these opinions in connection with his RFC assessment.  As the Commissioner is aware, however, if the ALJ assigns less than controlling weight to the opinion of Mayo's treating physician, his reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).

Next, Mayo argues that the ALJ erred because he failed to consider the effect of Mayo's right hand carpal tunnel syndrome and chronic obstructive pulmonary disease in his RFC assessment even though he found these impairments to be severe.  Doc. 12, p. 17.  Because remand is already appropriate, the ALJ should also consider the functional limitations, if any,

resulting from Mayo's carpal tunnel syndrome of the right hand and chronic obstructive pulmonary disease in his RFC analysis.

Finally, Mayo contends that the ALJ erred because his hypothetical question to the VE did not accurately portray Mayo's physical and mental impairments.  The undersigned will not reach this argument because, on remand, the ALJ's evaluation under the sequential analysis may change, thereby rendering this argument moot.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Cassandra Mayo's application for SSI should be **REVERSED and REMANDED.**[6]


Dated: November 5, 2012

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[6]  This report and recommendation should not be construed as an advisory opinion favoring a finding of disability on remand.